## SAYLES vs. WILSON

(No. 1071, February 15th, 1924; 222 Pac. 1020.)

DISMISSAL—NONSUIT—LANDLORD AND TENANT—CROPPER'S CON-
TRACTS—LANDLORD AND CROPPER—WORDS AND PHRASES.

1. Where neither of the grounds for dismissal of a civil suit
enumerated in Comp. St. 1920, § 5878, exist, and, in view
of section 5879, providing that in all other cases the deci-
sion must be on the merits, it is not error to overrule a
motion for a nonsuit against plaintiff.

2. A contract stating that it was a lease, but which did not
give the so-called lessee exclusive possession of the prem-
ises, but only the right to raise certain hay thereon, the
rent to be "one-third," and the renter did not live on the
premises and did not occupy himself therewith after the
farming season, *held* to create the relation of landlord
and cropper, a cropper being one who, having no interest
in the land, works it in consideration of a portion of the
crop.

3. A contract creating the relation of landlord and cropper,
providing for the payment of hay raised at a stated price
per ton, computed on all the hay except the amount allow-
ed the cropper for his own use and for use upon the prem-
ises, construed to require the hay to be grown, harvested,
put up, stacked, and fenced on the premises for the bene-
fit of the landlord and then to become his property.

ERROR to District Court, Park County; JAMES H. BUR-
GESS, Judge.

Action by D. H. Wilson against Frank L. Thayer, Henry
Sayles and the Sayles Sheep Company, upon a cropper's
contract to enjoin removal of crops. There was a judgment
for plaintiff and the last two named defendants bring error,
joining defendants Thayer as defendant in error.

*Enterline* and *Maley* and *J. H. Van Horn* for plaintiffs
in error.

The finding of the trial court that the lease could not be
reformed is sustained by the evidence, Stoll v. Nagel, 15
Wyo. 86; Grieve v. Grieve, 15 Wyo. 358; Weltner v. Thur-

man, 17 Wyo. 268; 24 Cyc. 1067, 8 R. C. L. 86. The lease being for five years was a conveyance requiring acknowledgment before it could be recorded, 4576 Comp. Stats.; it was not recorded, there was no constructive notice of its existence; no covenants were implied, 4526 Comp. Stats. the interpretation put upon the contract by the parties will be adopted by the court, Denio Co. v. Malin, 25 Wyo. 143. The parties construed it as a lease, the lessee's interest in the crop is subject to levy and sale, 8 R. C. L. 22, Wagner v. Buttles, 151 Wis. 668, 138 N. W. 425, Ann. Cas. 1914B, 144; Colville v. Miles, 127 N. Y. 159, 24 A. S. R. 433; Cook-Reynolds Co. v. Wilson, 214 Pac. 1104. Objections interposed by plaintiffs in error to evidence mentioned in the statement should have been sustained, plaintiff failed to establish a case against plaintiff in error, and their motion for nonsuit should have been sustained.

*Lonabaugh* and *Wenzell* for D. H. Wilson, defendant in error.

The court held that the interpretation put upon the contract by the parties should govern, Denio Co. v. Malin, 25 Wyo. 143; Rohrbaugh v. Mokler, 26 Wyo. 514; in the absence of oral testimony it would be impossible to determine what the agreement was; the trial court was right in holding the contract to be of hire, in so far as it related to hay; crops from leased lands during tenancy are the property of the tenant, in the absence of any stipulation affecting it; the agreement in effect was a cropper's contract, 8 R. C. L. 19; Kelly v. Rummerfield, 98 A. S. R. 953, and cases in note; possession of the ranch was never surrendered to Thayer, nor did he at any time live upon it, Wilson having retained posesssion, the rights of landlord and tenant were not created by the contract, but simply those of landowner and cropper.

POTTER, Chief Justice.

This suit was brought in the district court by D. H. Wilson, as plaintiff, against Frank L. Thayer, Henry Sayles

and the Sayles Sheep Co., a corporation, as defendants, and the case is brought here on error by the two last named defendants, complaining of the final judgment rendered in favor of the plaintiff upon a trial to the court without a jury; the defendant Thayer and the plaintiff being joined as defendants in error. The controversy arose out of a written contract entered into on the first day of March, 1918, between the said Wilson as party of the first part and Thayer as party of the second part. Omitting the paragraph stating the date and the names of the parties, the contract reads as follows:

"That the said party of the first part, for and in consideration of the covenants and agreements hereinafter mentioned, to be kept and performed by the said party of the second part, executors and administrators has demised and leased to the said party of the second part, all those premises situated and being in the County of Park, and the State of Wyoming, known as follows, to-wit: All lands belonging to party of first part, except leases, sheep pasture, potato ground and coal mines.

To have and to hold the above described premises, with the appurtenances, unto the said party of the second part, his executors, administrators and assigns, from March 1st, 1918, for and during and until March first, 1923. And the said party of the second part, in consideration of the leasing of the premises aforesaid by the said party of the first part, to the said party of the second part, does covenant and agree with the said party of the first part, heirs, executors, administrators and assigns, to pay to the said party of the first part, as rent for the said premises, the sum of one third. The said party of the second part agrees to brush meadows, clean all ditches and laterals, and irrigate and put up hay and fence stacks all in good for $4.66 2/3 per ton. If hay is not put up in good condition, it is forfeit. Party of the second part to reserve not exceeding 25 tons of hay on all places for own use, river place not included. And the said party of the second part further covenants

with the said party of the first part, that said party has received said demised premises in good order and condition, and at all expiration of the time mentioned in the lease will yield up the said premises to the said party of the first part in as good order and condition as when they were entered upon by the said party of the second part, loss by fire or inevitable accident, or ordinary wear excepted, and will also keep said premises in good repair during the lease, at his own expense.

It is further agreed by the said party of the second part that neither he or his legal representatives will underlet said premises or any part thereof, or assign this lease, without the written consent of the said party of the first part had and obtained thereto.

The party of the second part agrees to stack and fence in good condition all unmatured grain that cannot ripen, for hay at $4.66 2/3 per ton.

All brush land party of second part puts in, he gets all he raises first year and furnishes seed, and party of first part gets straw and pasture. Party of the first agrees to pay $1.25 per hundred for grain except what is kept by party of second part for own use, which is not to exceed 1/4.

Party of the first part gets all straw and pasture, party of second part fences all straw piles in good condition. The party of second part is to sell no grain other than to party of the first part. If the party of first part furnishes seed he gets 1/6 of grain raised on brush land. Party of second part agrees to furnish all help to haul and deliver grain to bin of party of first part. Bins to be placed where grain is raised.

Party of the second part agrees to sow any grass seed with grain and to irrigate same so as to protect seed from drouth. Party of the first part agrees to furnish seed. The party of the second part is to cut no timber or use any useful material such as posts, stays, poles for firewood. If party of the first part furnishes seed grain, party of second

part returns same at threshing with interest at 10% from time of seeding until time returned.

Party of second part is not to receive any pasture or any of his help. Party of the first part is to furnish a reasonable amount of money for wages for work done on ranches of party of first part at 8% interest. The said party of the second part agrees to have all stacks fenced by October 1st. It is agreed between first and second parties that hay is to be fed where it is. And the biggest share of cattle is to be off by May 1st. The party of second part is not to cut any posts or stays without permission of party of first part, on said premises. Party of first part agrees to furnish all material for any new flumes, ditches and headgates;

Party of first part agrees to furnish money to pay two irrigators, also $5.00 an acre for crop plowing and $3.00 an acre for summer fallowing. Payment to be made the 15th of each month, also money to pay men for haying. Party of the first part agrees to furnish all material for fences such as hay corrals and outside fences. Hay to be measured thirty days after stacking, according to State rule.''

The suit was commenced on November 4, 1919, to enjoin the threatened removal of hay from the premises. The amended petition upon which the case was tried was filed November 13 of that year. It alleges the plaintiff's legal ownership and possession of certain lands, but stating that the agreement to lease was for a portion only thereof, viz: ''the hay meadows and farming and cultivated grounds.'' It alleges further that the agreement as written does not contain the entire contract, and is uncertain, ambiguous and contradictory, in that it fails to state the manner, the time when, and whether in property or money, the defendant should pay one-third, or to what crops that provision related; fails to clearly state that plaintiff was to retain all hay on the premises, except 25 tons; fails to state the true agreement that plaintiff was to pay defendant $4.66 2/3

per ton for irrigating, stacking and fencing said hay, clean-
ing ditches and brushing the meadows; fails to state that
plaintiff agreed to pay that sum for the unmatured grain
to be stacked as hay, or that said grain, when so stacked,
should be plaintiff's property; fails to state that plaintiff
reserved for his own use the houses and other buildings on
the premises, and to state clearly that the hay was to be fed
by plaintiff on the premises where stacked; all of which were
intended by the parties to be included in the contract, but
were not so included through the oversight and mistake of
plaintiff's son in preparing the agreement, but which errors
and omissions were not the result of carelessness or negli-
gence on plaintiff's part, and were not discovered by him
until the fall of 1919.

Said petition further alleges that when the agreement was
made the plaintiff was and ''still is'' the owner of about
1200 head of cattle, and that said contract was entered into
with the knowledge that said cattle were being run, fed and
grown in connection with plaintiff's said lands, and that
said hay was to be put up and stacked by the defendant for
the plaintiff, and for the purpose of feeding his said live
stock on the premises each winter season, the possession of
which was to be retained by the plaintiff for that purpose
and for pasturage. That plaintiff had and has no other
place to feed his cattle, and no other hay for that purpose,
and that he is not able to obtain hay elsewhere at the cost
provided in the contract or at any reasonable price. That
plaintiff has complied with all the terms and conditions of
the contract to be kept and performed and is ready and
willing to carry out and perform the agreement on his part.
The petition then alleges a settlement between the parties in
the fall of 1918 for that year, including a payment by plain-
tiff to the defendant for the amount due him, in all respects
according to the contract as agreed upon between the par-
ties, and that plaintiff, during the winter of 1918-19, fed
said hay to his said live stock. Likewise that in the year
1919, the hay was cut and stacked and delivered to plaintiff

and the amount due to said Thayer was agreed upon between them.

It is then alleged that the defendant, without any permission or authority from the plaintiff, on or about October 25, 1919, had wrongfully, fraudulently and unlawfully pretended to sell said hay to the other named defendants, agreeing to haul and deliver the said hay away from plaintiff's premises, contrary to the said agreement. That the said defendants, Sayles and Sayles Sheep Company had notice and knowledge and the means of notice and knowledge of plaintiff's ownership in said hay, and that said hay was to be fed on the premises where it was. It alleges the insolvency of the defendant Thayer and his resulting inability to respond in damages to the plaintiff for his said wrongful acts, and prays that a temporary restraining order be granted enjoining the said defendants from trespassing upon the premises of plaintiff, and from hauling said hay therefrom, or in any way interfering with the plaintiff in his ownership, possession and use of the hay; that the temporary restraining order previously issued be made perpetual upon final hearing; that the contract be reformed to express the true intent and meaning of the parties thereto, and that as reformed the defendant Thayer be required to specifically perform the same. That is followed by a prayer for general equitable relief.

To that petition the answer of defendants Sayles and Sayles Sheep Company was filed, denying, for want of knowledge, the averments as to the contract aforesaid, and alleging that said sheep company is the owner of 12,000 sheep ranging in Park County, and had purchased in good faith the hay mentioned in the petition from the defendant Thayer for $20.00 per ton, to feed to its sheep, and without notice of the alleged contract or rights of plaintiff; that said hay was the property of said company, and by reason of the injunction it is wrongfully restrained from using the same. The prayer is that plaintiff take nothing, and for costs. The pleading, if any, of Thayer, is not brought into the record

here.   He appeared, however, at the trial and testified in his own behalf.

It appears from the pleadings and judgment that a temporary restraining order had been issued, but it is not in the record here.  However, as made perpetual by the judgment, it enjoins the defendants and each of them from hauling any of plaintiff's said hay from the premises, and from in any manner interfering with plaintiff in his possession, use, ownership and enjoyment of the hay.  And that is the only relief granted by the judgment, except that it awards the plaintiff his costs.  The judgment recites that a reformation of the contract is not necessary, but only that the contract be construed in the light of its terms and the practical construction given it by the parties to it.

At the close of the plaintiff's evidence in chief upon the trial, the plaintiffs in error here, through their counsel, orally moved the court for a non-suit and that the action be dismissed as against them "for the reason that the evidence given is wholly insufficient to prove a cause of action in favor of the plaintiff and against these moving defendants, to entitle the plaintiff to any equitable relief against these moving defendants."   Also that the temporary restraining order be vacated and dissolved for the same reason, and that it be "determined, adjudged and ordered" that said injunction ought not to have been granted.  That motion was overruled, to which an exception was noted.  Within the proper time after the rendition of the judgment in the case, said plaintiffs in error also filed a motion for a new trial in which it was stated that the court erred in overruling the motion for a non-suit and dismissal, and also in refusing to vacate and dissolve the temporary restraining order and to determine and adjudge that the same ought not to have been granted.  And the petition in error contains two assignments of error:  1. That the court erred in overruling said motion for a non-suit and failing to make and enter a non-suit against the plaintiff and in favor of said defend-

ants. 2. That the court erred in denying the separate motion of said defendants (plaintiffs in error) for a new trial.

There is no merit in the first assignment of error. The motion was properly overruled without reference to the sufficiency of the evidence. The said assignment, as well as the motion aforesaid, disregards the established practice in this state respecting an involuntary non-suit or dismissal of a civil action. The code provides that the court may dismiss a petition with costs, in favor of one or more defendants, in case of unreasonable neglect on the part of a plaintiff to serve summons on other defendants, or to proceed against the defendant or defendants served. Comp. Stat. 1920, Sec. 5878. And provides in the next succeeding section that an action may be dismissed without prejudice to a future action: 1. By plaintiff before final submission of the cause to the court or jury. 2. By the court, where plaintiff fails to appear at the trial. 3. By the court for want of necessary parties. 4. By the court on application of a defendant, where there are others whom the plaintiff fails to prosecute with diligence. 5. By the court for plaintiff's disobedience of an order concerning the proceedings. 6. By the plaintiff, in vacation, on payment of costs. Following the statement of those numbered grounds it is then provided in the same section: ''In all other cases the decision must be upon the merits, upon the trial of the action.'' Id. Sec. 5879.

At the March term in 1882 of the territorial Supreme Court, the immediate predecessor of this court, it was held that a non-suit is not a judgment nor the final determination of a cause, and that under the last cited section of the code a district court has no authority to order a peremptory non-suit against the will of the plaintiff. Mulhern v. U. P. R. R. Co., 2 Wyo. 465; Hoy v. Smith, id. 459. In the Mulhern case, wherein the plaintiff had been non-suited at the close of his evidence upon motion of the defendant, upon a trial before a jury, the question was presented on both sides by able counsel, and each urged the court to decide the case upon the whole record, although appellant's counsel con-

tended that the non-suit was improper. But the court declined to do that, and in the course of an exhaustive discussion, by Chief Justice Sener, said:

"What is a decision upon the merits? It is a decision upon the justice of the cause, and not upon technical grounds only. * * *. Now in every case where a non-suit is unprovided for, there must be, upon the trial, a decision upon the merits. Now let us ascertain the meaning of the word 'decision;' Bouvier's Dictionary says it is a judgment given by a competent tribunal. Abbott says it is the result of the deliberations of a tribunal, the judicial determination of a question or cause. By Sec. 377 of our code, a judgment is the final determination of the rights of parties in action. Surely a non-suit is not a decision. It is no judgment in the sense of our code, nor is it the judicial determination of a question or cause, for after the entry of a non-suit, a new suit may be brought. In this case, there was no decision by the jury, no final determination, and so no final judgment could be entered. * * * If the cause has no merit, either in law or upon the evidence, let the court, by an instruction, either of its own motion, or upon request, say so to the jury. If the cause has merit, and a jury is called, they are to decide it upon its merits, under such instructions as may be given by the court. * * * Once begun before a jury, a trial must end in a verdict unless the plaintiff voluntarily becomes non-suited in one of the three ways heretofore pointed out. A non-suit does not decide the case upon the merits. Under neither of the subdivisions heretofore quoted, can a non-suit entered in this case be justified or sustained. So it is unsustained at common law, and unsustained and unauthorized by our statute."

Preceding these remarks, the learned judge had shown when a nonsuit could be entered at common law, as well as under the statute aforesaid. In the cited case of Hoy v. Smith, decided the same day, the court, by the Chief Justice, said further:

"As we have shown in the case of Mulhern vs. The U. P. R. R., this day: a non-suit was grantable at common law for certain reasons therein stated, and is also allowable for certain reasons and on certain grounds stated in the Wyoming code. But this case is covered by none of them; or rather the action of the judge who tried this case in the court below is not authorized either by the common law or the Wyoming code, in granting a non-suit upon the defendant's motion and against the will of the plaintiff, an objection being made at the time and an exception duly taken. We will not go behind this action of the judge to decide whether the pleadings were sufficient or insufficient. If they were insufficient, i. e., if the law was against the plaintiff, the court of its motion, or upon the request of the defendant below, might have instructed the jury to find for the defendant, and if the court so held or believed, it would have been its duty so to have instructed; upon its granting or refusing such instruction, and proper exception taken at the time, a cause could have been made up and brought here which would have been our duty to decide. But a trial by jury was begun in the lower court, i. e., the district court * * *, and the judge presiding * * * erroneously took the case from the jury and so prevented a trial. We will not try it for the first time here, nor will we pass upon the sufficiency of the pleadings at this time."

Our court did not then overlook the fact that our civil code was taken from Ohio, or the Ohio decisions upon the question; but referred to the fact in the opinion in the Mulhern case and stated that the decisions in that state had been conflicting but that the latest on the question, Byrd v. Blessing (11 O. S. 362), came nearer to its idea of a true interpretation of the statute. That case, it may be said in passing, held that it was error to enter a judgment of non-suit and discharge the jury without a verdict after evidence has been received. The court in that case, however, looked into the record to see whether the plaintiff had been preju-

diced by that error, and it not appearing by the record that he had not been prejudiced, the judgment was reversed. Our court, referring to that, declined to approve such action and said:

"But after rendering a proper decision, as we think, the court goes, in our opinion, beyond the code of its state and undertakes to justify its decision upon the facts. This course we do not approve and cannot follow, because to do it is, in our judgment, to have in the first instance in an appellate court, the trial. * * * Courts can in certain cases control their (the jury's) decisions, when there is neither law nor evidence to sustain a verdict for a plaintiff; but law and sound practice (at common law, and under our code of procedure) have established the methods, they are known to the law and lawyers, and must be pursued. Their observance will always bring a party into an appellate court in such a way that any error or wrong may be reviewed and corrected. And to a practice so sound in principle, and so ample as to do justice in all cases, sustained as it is by law and precedents, we hold ourselves bound, rather than to follow a practice which in our judgment would be a violation of law and precedents."

In another case decided at the next term (Friend v. Oggshaw, 3 Wyo. 59, 31 Pac. 1047), where a jury had not been impanelled, but the district court, on defendant's motion supported only by his own affidavit, had ordered a dismissal, that action was reversed, the court saying:

"At the last term of this court, this question of dismissing actions on the defendant's motion, and against the objection and will of the plaintiff, was exhaustively considered in the case of Mulhern v. Railroad Company, 2 Wyo. 465, to which reference is here made. That case, it is true, differs slightly from this in the fact that there a jury had been impanelled, but inasmuch as neither at common law, nor by the statutes of this territory, can a suit be dis-

missed where the plaintiff was in no default as to appearance, parties, or allegations that he had failed to prosecute with diligence, or had failed to obey some order concerning the proceeding in the action, neither of which grounds are alleged in the motion which was sustained in the court below, and to which exception was taken, and is under review here, we are compelled, to conclude, under the statutes of Wyoming, this being an action for the recovery of real property, that the plaintiff was entitled to a trial upon the issues of fact arising in the action.''

In the recent case of Bader v. Mills & Baker Co., 28 Wyo. 191, 201 Pac. 1012, this court said:

''The motions for non-suit were properly overruled. Such motion cannot take the place of a motion to direct a verdict. The case of Mulhern v. Union Pacific Railroad Company, 2 Wyo. 465, is decisive of the point. It fully discusses this subject, and holds that a case can only be dismissed in accordance with the provisions of the Code * * *, and hence that the court has no power to order a peremptory non-suit against the will of the plaintiff.''

The rule of the common law is that a plaintiff can not be nonsuited for failure of proof. 6 Ency. Pl. & Pr., 933. And our early decisions aforesaid did not misstate the meaning and effect of a non-suit. It is said in 14 Cyc. 391 and 18 C. J. 1145: ''Dismissal signifies the final ending of a suit, not a final judgment on the controversy but an end to that proceeding.'' And again, in Cyc. of the same volume, at page 393: ''A non-suit is not a final disposition of the cause and does not bar another suit upon the same cause of action.'' Of course, where the statute permits an order of non-suit under circumstances such as those found in this case, or in the Mulhern and other Wyoming cases cited, a non-suit may be a judgment upon the merits when peremptorily ordered for a failure or insufficiency of evidence. 18 C. J. 1147. But our decisions have been based upon the ab-

sence of any provision authorizing a non-suit except for certain specified reasons. See also 18 C. J. 1200, Sec. 129; 14 Cyc. 425, 451; 6 Ency. Pl. & Pr. 877; 2 Thomp. on Tr., 2nd Ed. by Early, Secs. 2227, 2228.

The attempt to import into our procedure a practice so emphatically disapproved by our decisions has seemed sufficient to justify the length of the above discussion referring to our previous decisions. Our civil code provisions aforesaid have remained without change since those decisions, and, while this is only a question of practice, we see no reason for changing the established rule. No doubt a different practice may obtain in some other states,—whether under similar or different statutory provisions we shall not take the time to inquire. But a proper motion in every case is open to a defendant without resorting to a practice disapproved many years ago as inherently wrong. Upon a trial to the court without a jury, a motion may no doubt be made at the close of plaintiff's evidence for judgment for insufficiency of that evidence, to be granted by the court upon finding that such evidence is insufficient to sustain the cause of action. But there should then be a judgment showing a "decision upon the merits."

It is stated in the brief of plaintiffs in error that upon the overruling of their motion for non-suit they rested their case and did not participate further in the trial. We do not notice a direct mention of that fact in the record, though it might possibly be inferred from their failure to introduce evidence, and the fact that their counsel of record is not mentioned as participating in the examination of witnesses thereafter called. But one of Thayer's attorneys of record did interpose objections to questions on the cross-examination of Thayer, because incompetent and irrelevant "as against Sayles and Sayles Sheep Co.," which objections were sustained. That may be regarded, however, as immaterial. The withdrawal of said defendants from the trial was no doubt for the purpose of avoiding the possibility of a waiver of their exception. Their motion being improper

under our practice, and its denial proper on that ground without reference to the evidence, such withdrawal was without purpose or affect, and should not have been permitted to interfere with the progress of the case in the same manner as though the motion had not been made. And the progress of the trial does not appear to have been disturbed by such action, except in one particular which may be disregarded here, since it tended to injure no one but the plaintiff.

Aside from the ground based upon the exception to the ruling upon the motion for non-suit, the overruled motion for new trial complained of the judgment as contrary to law and not sustained by sufficient evidence. It alleged error also in the admission of evidence over objection, but stated in general terms only; and that matter is mentioned in the brief of plaintiffs in error only by asserting generally that such evidence should have been excluded. Since the objections are not specifically pointed out in the brief or discussed, we do not feel called upon to rule upon or discuss the matter, except to say that the objections seem to have related to evidence to prove plaintiff's alleged title to the hay and his right to its possession, which depended upon his agreement with Thayer, the other defendant, and what was done thereunder. As against a mere general assertion of error in receiving such evidence, we can see no reasonable ground for the objections to it by the complaining defendants to whom the hay had not been delivered, and whose right thereto, if any, was obtained from Thayer, without plaintiff's consent.

The only point to be specially considered, therefore, under the second assignment of error is the sufficiency of the evidence. The contention of plaintiffs in error in that respect is that the contract between Wilson and Thayer created the relation between them of landlord and tenant; and they rely upon the principle quoted in their brief that the annual crop raised on leased property, when matured and severed from the soil during the term of the lease, becomes

the tenant's personal property, which he may dispose of as he sees fit, in the absence of a provision in the contract that the crop will be the property of the landlord until the rent is paid or secured, citing 24 Cyc. 1067-1068 and 8 R. C. L. 362, and cases cited. We prefer the more comprehensive statement of that principle in R. C. L. at the page cited, viz: That such annual crop is the tenant's property "in the absence of any stipulation affecting it." It is stated in one of the briefs that the trial court found the contract in this case, so far as the hay is concerned at least, to be a contract for hire, which would leave the hay, when put up and stacked on the premises as provided, in the contract, the property of Wilson, the owner of the land. Assuming that the court so found, we agree with it in that conclusion. For, even if the contract should be considered only as a lease, creating the relation of landlord and tenant, the provision in the contract as to the hay is a "stipulation affecting" it as a part of the crops, preventing it from becoming the property of the tenant under the general rule aforesaid where no other provision is made concerning it. The contract provision to pay as rent "the sum of one third," standing alone, appears to be ambiguous. It is conceded, however, in the testimony of both parties, that it was intended to mean one third of the hay.

It is there stipulated as to the hay that Thayer, the second party named in the contract, agrees to brush meadows, clean all ditches and laterals, irrigate and put up hay, and fence stacks, all in good (condition), for $4.66 2/3 per ton; reserving for his own use not exceeding 25 tons; that all stacks are to be fenced by October 1; that the hay is to be fed where it is; that most of the cattle are to be off by May 1. And further, that the land owner is to furnish all material for fences such as hay corrals and outside fences, and that hay is to be measured thirty days after stacking; that all unmatured grain is to be stacked and fenced in good condition for hay at the above mentioned price per ton. The testimony of both Wilson and Thayer shows that the

said price per ton was to be computed and was in fact computed upon all of the hay except the 25 tons reserved for the latter's use.  That is to say, that Thayer was to receive that price per ton for the one-third mentioned in the contract as rent as well as the other two-thirds.  And they each testified that the stated amount was agreed upon as providing an amount equal to $7.00 per ton for two-thirds only of the hay.  And that price or amount seems to be specified in the contract as compensation for the work mentioned,—brushing meadows, cleaning ditches and laterals, irrigating, putting up, stacking and fencing the hay.  While it is provided that the hay is to be measured thirty days after it has been stacked, there is no provision for dividing it into thirds, or one-third and two-thirds, or in any other manner, nor any provision for taking it off the premises.  On the contrary, it is expressly provided that the hay is to be fed where it is, and the period of such feeding seems to be to some extent limited by the provision that all stacks are to be fenced by October 1, and most of the cattle are to be off by May 1, indicating a feeding of cattle during the late fall, winter and early spring months.

Looking only at the contract, therefore, and assuming that it may create the relation of landlord and tenant, it may well be construed as providing that the hay is to be left upon the premises as and where stacked and fenced for the use of the land-owner or as his property, and limiting the other party's right concerning it, aside from the 25 tons reserved for his own use, to a claim for the price or amount fixed in the contract for his work and labor.  And that becomes clearer when the facts of the situation of the parties are considered, as they must be in construing the contract, and especially the fact that it was plaintiff's custom to feed his cattle upon the premises during the feeding season aforesaid, and that they were in fact so fed during the first year of the contract, commencing with the fall of 1918 and ending in the spring of 1919, without objection, and after the parties had made a settlement for that year, as well as the

failure of the evidence to show that Thayer had cattle or other stock to be fed the hay upon the premises, except the 25 tons reserved for his own use.

But we are not convinced that the contract is to be considered as creating the relation of landlord and tenant. Notwithstanding the statement in the contract that the premises are leased, and that it mentions rent, and notwithstanding also the provision that the second party will yield up the premises at the expiration of the "lease" and keep them in good repair during the "lease" we think that in view of the circumstances under which the contract was made, and its practical construction by the parties themselves, the better interpretation of its provision is that it creates the relation, not of landlord and tenant, but landlord and cropper.

"A cropper is one who, having no interest in the land works in consideration of receiving a portion of the crop for his labor." 12 Cyc. 979; 17 C. J. 382. The principle of construction applicable here is stated in Corpus Juris (page 382) as follows:

"The intention of the parties as expressed in the language they have used, interpreted in the light of the surrounding circumstances, controls in determining whether a given contract makes the cultivator a cropper. If the language used imports a present demise of any character by which any interest in the land passes to the occupier, or by which he obtains the right of exclusive possession, the contract becomes one of lease, and the relation of landlord and tenant is created. If, on the other hand, there is no language in the contract importing a conveyance of any interest in the land, but by the express terms of the contract the general possession of the land is reserved by the owner, the occupant becomes a mere cropper."

It is said on this subject in 8 R. C. L., page 373:

"No general rule can be laid down applicable to all agreements of this kind, because the precise nature of the interest or title between the contracting parties is largely a question of their intention as expressed in the language they have used, and hence must depend on the particular provisions of the contract itself and the subject matter, and the circumstances surrounding the execution of the contract, in the light of which it must be interpreted. * * * But the rule seems to be, that where the landlord furnishes the land and supplies, and other things of that sort, and keeps general supervision over the farm, and agrees to pay a certain portion of the crop to the laborer for his work, the laborer is then a cropper. * * * The difference between a cropper and a tenant is, that a tenant has an estate in the land for the term, and consequently he has a right of property in the crop. If he pays a share of the crop for rents, it is he who divides the crop, and turns over the landowner his share, and until such division the right of property and possession in the whole is his. A cropper has no estate in the land, and although he has in some sense the possession of the crop, it is only that of a servant, and the possession is in law that of the landowner, who must set off to the cropper his share."

The rule for determining the character of such an agreement is stated also in Am. & Eng. Ency. of Law, 2nd Ed., pages 174 to 176 inclusive. It is there said that the criterion is the intention of the parties, which is to be ascertained from the terms of the contract, the subject matter, and the surrounding circumstances; that the act of the parties showing their construction of the agreement may be controlling; that the manner in which the crops are to be divided may tend to show what was intended; that a reservation of a share in the name of rent is not conclusive; that while the use of technical words of demise will as a rule render the agreement a lease, it is not conclusive in favor of that rela-

tion, where the subject matter and the situation of the parties show that such was not the intention; that whether the agreement confers upon the cultivator the "exclusive" possession of the premises is a material factor, and that "if it does not confer such possession, the relation of landlord and tenant will not be created," though a tenancy may exist without the tenant being in fact in the exclusive possession.

It is very clear from the evidence that Thayer was not in fact to have exclusive possession of the premises, or any further possession than might be necessary for the work to be performed by him under the contract. He did not live upon the premises, but when the contract was made and thereafter he lived with his family about three-quarters of a mile from the premises in question, upon his own place. The plaintiff and his family did reside upon the premises when the contract was made, and continued to reside thereon thereafter, and they were residing thereon at the time of the trial of this cause. The plaintiff testified that it was understood when the contract was made that he should continue to reside there, and that is not disputed. It appears that after the farming season was over, Thayer did not regularly remain upon the premises. We think it is to be understood also that the cattle referred to in the contract were the plaintiff's cattle. In the fall of 1918 those cattle were put upon the premises and fed, and also in the fall of 1919. They were fed through the winter of 1918-1919 without objection, and it does not appear that there was any objection to placing the cattle upon the premises for feeding in 1919, though Thayer, for reasons explained in his testimony, agreed to sell the hay that fall to plaintiffs in error, which resulted in the bringing of this suit.

It is unnecessary and would unduly extend this opinion to go into the matter fully of Thayer's explanation of his attempt to sell the hay or his supposed interest in it. It amounted in brief to this: That plaintiff had not paid for the hay that year. Plaintiff, however, claimed to have paid all that was due, except the sum of $343.80, by crediting

the remainder of the contract price for putting up the hay that year, which amounted to $3178.12, upon plaintiff's account for advances in 1919 and the balance due him for machinery sold Thayer in 1918. Thayer had borrowed some money during plaintiff's absence from the state to pay the men employed in haying in 1919, which, he testified, plaintiff refused to advance, and he also testified that afterwards plaintiff refused to take up the said loan. Plaintiff, however, testified that he did agree to take up the loan, and he showed by other testimony that he attempted to do so, only to find that Thayer had paid it in the meantime. Of course had he taken up the loan, the amount must have been added to Thayer's indebtedness to him.

There are other contract provisions indicating that Thayer's relation to Wilson, the plaintiff, was to be that of a cropper only. Neither he nor his help were to have any pasture on the premises, and he was not to cut or use any useful material, such as posts, stays or poles for firewood, nor at all without the landowner's permission. The latter was to furnish all material for flumes, ditches, headgates, hay corrals and outside fences; have all straw and pasture, to have his share of harvested grain delivered into his own bins on the premises, and was to pay the same as for hay for all unmatured grain unable to ripen; to pay also a stated price for grain, except that allowed Thayer for his own use, who was not to sell any grain except to plaintiff. It is difficult from all this, with the other provisions aforesaid, to connect the supposed lessee with any interest in the premises, possessory or otherwise, except what might be necessary for the farm labor to be performed.

The plaintiff testified that Thayer went on the premises to work in the spring of 1918 and remained there until some time in the fall, when he, plaintiff, was to have possession of the lands for stock. "Then," as he testified, "from October until spring again, I had my stock there, and I was there, and I had my employees." We quote further from his testimony: "Q. Did Mr. Thayer exercise any control

of the land or was he in possession of the land during that period? A. No. Q. And in the fall of 1919 after the crops were put up and the hay was put up, what acts of possession did Thayer occupy or do? A. None whatever.''

The plaintiff's son testified:

''Q. You may state what time in the fall of 1919 your father's cattle were turned in on the meadows there if you know. A. Around the first of October somewhere. Q. It might have been a few days either way? A. Yes sir, around the first of October. Q. You may state whether or not the cattle were turned in on the meadows also. A. Yes sir. Q. About what time in 1918? A. I do not remember the date. It was later than it was in 1919. Q. Where did Mr. Thayer live and where does he live now? A. On the river, the Greybull. Q. Lived on your father's ranch? A. No sir. Q. Has a ranch of his own? A. Yes sir. * * * Q. Who was in charge of the cattle on the ranch during the winter, were you? A. I was for a while. Q. Mr. Thayer had nothing to do with the cattle, did he? A. No sir. Q. Now in the spring of the year when the cattle were taken off, what did Mr. Thayer do? A. He starts his farming.''

We conclude that the effect of the agreement as to the hay as finally expressed by the provision for the payment of a stated price per ton computed upon all of the hay except the amount allowed Thayer for his own use, and for its being fed upon the premises, was and is, construed in the light of the circumstances, that the hay should be grown, harvested, put up, stacked and fenced upon the premises for the benefit of the plaintiff and then to become his property. This view requires an affirmance of the judgment, and it will be so ordered.

*Affirmed.*

Blume and Kimball, JJ., concur.

NOTE—See 17 C. J. p. 382, 383; 18 C. J. p. 1179 (1925 anno)