BOND & MORTGAGE CORPORATION, APPELLANT, *v.* PULLEY, RESPONDENT.

(No. 7,129.)

(Submitted October 30, 1933. Decided November 9, 1933.)

[26 Pac. (2d) 645.]

338

Cause submitted on briefs of Counsel.

*Mr. M. L. Parcells*, for Appellant.

*Messrs. Duncan & Duncan,* for Respondent.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an appeal by plaintiff from a judgment in favor of defendant. It appears that on or about the first day of May, 1928, the Madison Sheep Company, a Wisconsin corporation, the immediate predecessor in interest of the plaintiff, also a Wisconsin corporation, and the defendant and one Lowell Phelps entered into a contract respecting the Armstrong or Lauterbach ranch, consisting of over 9,000 acres of land in Madison county, upon which the parties intended to engage in the sheep business; by the terms of the contract the sheep company agreed to lease the land to defendant and Phelps for a term of five and one-half years, or until November 1, 1933, unless the contract should be terminated by mutual consent of the parties, or forfeited, before the end of the term. The contract included

an option giving the defendant and Phelps the right to purchase the ranch for the agreed price of $100,000 at any time during its life. Phelps soon dropped out, apparently by mutual consent, and defendant carried on. For convenience we shall hereafter refer to defendant as if he were at all times the sole lessee named in the contract.

The plaintiff owned the land at the time the sheep company entered into the contract and lease, but afterwards conveyed it to the sheep company; in fact, the sheep company was organized by the directors of the plaintiff as a subsidiary of, or operating company for, the plaintiff. The contract was "a ranching agreement on shares in the form of a joint adventure"; by its terms each party was to own one-half the livestock and the equipment. The defendant was to do all the work, the idea being that the value of the use of the real estate and that of the labor should be considered equal. It was provided that in case the defendant should cut and stack a sufficient amount of hay and provide a sufficient amount of other feed to warrant so doing, not less than one band of 1,500 sheep should be placed on the premises on or before November 1, 1928, and at the option of the sheep company that number might be increased to two bands, or 3,000 sheep in all; each party was to furnish an equal number of sheep, and it was so agreed that if defendant were not able to furnish his one-half of the sheep, the company would advance funds at seven per cent. interest to enable him to do so, in which event the company should be entitled to reimburse itself for the money advanced to defendant out of the proceeds of sales of wool and sheep.

In connection with the agreement the defendant furnished a bond to the sheep company in the sum of $5,000 to insure his compliance with the contract. Stock and equipment were purchased, the company advancing the necessary capital therefor, and the ranch was operated under the plan contemplated in the contract and lease until 1930, when by reason of market conditions it was found impossible to carry on the sheep business at a profit. During that year it was mutually agreed to

sell the sheep and that was done, the proceeds being applied on an indebtedness for which the sheep were security.

In 1931 the sheep company sold all the equipment which had been purchased for operating the ranch, leaving it barren of machinery. Thereafter the defendant remained in possession of the premises, but, having no machinery with which to operate and no means with which to purchase machinery, he followed the course adopted the year before, that of harvesting the crops on shares; he did this without referring the question to the sheep company. Being unable to complete its contract to purchase the lands from the plaintiff, the sheep company on January 2, 1931, reconveyed the land to the plaintiff, which on the first day of July, 1931, served upon the defendant, and others not parties to this action, a written demand to quit the premises. The basis of the notice to quit is that by reason of the subletting of a portion of the premises without the consent of the plaintiff or the Madison Sheep Company, the defendant had breached the contract. When the demand was not complied with, the plaintiff began this action for unlawful detainer, asking for a restitution of the premises and for damages.

The complaint is in two causes of action, the first resting on the theory that the contract had been terminated by mutual consent as of the first day of December, 1930; and the second that the defendant had violated that clause of the contract which expressly provides "that this contract shall not be assigned or the premises sublet without a written consent of the first party," it being alleged that without the written or other consent of plaintiff or the sheep company, the defendant on or about the twenty-ninth day of April, 1931, sublet a portion of the premises to one Cook, and on or about the twenty-seventh day of May, 1931, sublet a portion thereof to one Cornforth.

The defendant answered to both causes of action, denying that the contract had been terminated by mutual consent or otherwise, and claiming that it was still in full force, and denying that any portion of the premises had been sublet to either Cook or Cornforth. A copy of the contract was annexed to

the answer. After a demurrer to the answer had been over-
ruled, the plaintiff filed its reply, and the case went to trial
before the court sitting without a jury.

The court found that the defendant had complied with all
the terms and conditions of the contract required to be per-
formed by him, that he had never consented to the termination
of the lease, and had not sublet the lands and premises in
violation of the conditions and terms of the lease or otherwise,
and therefore that defendant was entitled to a judgment dis-
missing the action, and for his costs. Judgment was entered
accordingly.

1. The evidence discloses that in the year 1930 the directors
 of the sheep company and the defendant were forced to
conclude that the venture was a failure; neither had means to
carry it on, and it was agreed that the only thing to do was
to sell the sheep and apply the proceeds upon the indebtedness,
and this was done. By reason of a shortage of funds it was
suggested to the defendant, by those acting in behalf of the
company, that it probably would be advantageous to harvest
the crops on shares and to dispose of the pasturage to the best
advantage; he agreed, and that course was followed. A series
of letters passed between members of the directorate of the
sheep company and the defendant, in which a termination of
the relation between that company and defendant was dis-
cussed. At one time the parties were close to an agreement,
but a definite conclusion was not reached; matters of difference
existed and persisted. Without canvassing the evidence, which
has been analyzed carefully, it is perhaps sufficient to say that
we are satisfied the court was justified in finding that the de-
fendant did not consent to a termination of the lease.

2. On April 29, 1931, the defendant gave to one Cook a
 writing reading as follows: "I have agreed to take in
200 head of cattle and horses, more or less, for L. A. Cook or
assignees of his from April 29, 1931, to December 15, 1931,
for the agreed price of $125 from date to date, to be pastured
in what is known as Roundbarn field. Payment received."
This writing was assigned to Cornforth. It is obvious that this

was nothing more than an agreement to pasture the cattle and horses in the Roundbarn field during the period mentioned.

What was denominated a "hay agreement" was entered into between defendant and Cornforth on May 27, 1931. The ·document is in somewhat formal language, but the purport of it is that Cornforth agreed with defendant "to harvest and properly stack in a husbandlike and farmerlike manner all hay growing or to grow" in the north field of the Lauterbach ranch during the season of 1931. One-half of the hay· harvested and stacked was to belong to the defendant, and the other half to Cornforth. Cornforth agreed to purchase defendant's half for $500, with the provision that this half should not be Cornforth's until the purchase price be fully paid. It was agreed that if Cornforth purchased defendant's half according to the agreement, then Cornforth should have the use of the pasture in the north field during the fall and winter of 1931–1932, that privilege to end on March 15, 1932; and Cornforth agreed to keep in repair the fences around the north field "in order to protect his hay crop and pasture from other stock."

Here and there language may be found which would seem upon first impression to sustain plaintiff's argument that the contract between defendant and Cornforth amounted to subletting of a portion of the leased premises, but upon the fact conditions presented the court's conclusion that there was not is sustained by authorities.

In *Baldwin* v. *Jacobs*, 182 Iowa, 789, 166 N. W. 271, 272, it appeared that one Jacobs was the owner of a farm which he leased to Archer for one year. Before the expiration of his lease Archer sold considerable rough feed in the form of shocked corn, with the option to the purchaser either to remove the same or to feed it upon the place. He also had upon the place considerable other rough feed in the form of standing cornstalks and blue grass. Baldwin purchased the removable rough feed and exercised the option to feed it upon the place; he also had an arrangement with Archer whereby he was to bring cattle upon the place and feed the standing rough feed at the price of $1 per head per month. While this contract was in the

course of performance, Jacobs, the landlord, brought action against Baldwin and Archer whereby he charged a breach of the lease by Archer ''in that he had sublet the premises or assigned his lease thereon.'' In its opinion the court said: ''It may be conceded that the arrangement between Archer and Baldwin bordered close to an assignment or subletting. And yet there is surely a field within which a tenant may freely contract with third parties for the sale and utilization of the products of the farm. It is not unusual that an occupant of land deems it advantageous to sell his matured crop while standing in the field. Such an arrangement necessitates an entry by the purchaser for the purpose of utilizing the crop. It has been held that such an arrangement is not a violation of a proviso against subletting. (*Kirkpatrick* v. *Fonner,* 82 Neb. 32, 116 N. W. 779.) Taking the testimony of Archer and Baldwin as true as to what the arrangement between them was, we think it quite clear that it worked no violation of the terms of the lease.''

The supreme court of California, in *Harrelson* v. *Miller & Lux,* 182 Cal. 408, 188 Pac. 800, 802, held the same view. In that case Harrelson was the landlord, and Crow the lessee. Crow granted to Miller & Lux the right to pasture the land, of which Crow was the lessee, with sheep. The court said: ''Plaintiff insists, however, that whatever may have been Crow's rights to pasture the grain land himself, the granting of the right to the defendant amounted to a violation of the covenant in the lease against subletting. The contract between Crow and defendant amounted essentially to a sale of the feed coupled with a mere license to come upon the land to use it. If Crow had a right to sell the feed at all, he certainly had a right to grant the right to use it on the land, for obviously the stubble at least could not be otherwise utilized. That the granting of such a right is not a violation of a covenant against subletting has been directly held in *Baldwin* v. *Jacobs,* 182 Iowa, 789, 166 N. W. 271, 273. This view not only accords with the rule that such covenants should be strictly construed, but it also accords with a fair and reasonable construction of

the covenant as forbidding the letting of the premises to a third person for the purpose of using them as it was provided that the lessee should use them, viz., for the purpose of raising grain and the development of such other interests as are usually incidental to farming.''

We think it is clear, the terms of the contract considered, that it was not the intention of defendant to transfer to Cornforth any interest in the land and that he did not do so. If Cornforth had not seen fit to buy defendant's half of the hay, the two would have owned the same in common at least until ▆ division. Tenancy in common may exist in crops and none whatever exist in the land. See the well-considered case of *In re Okahara*, 191 Cal. 353, 216 Pac. 614, with numerous supporting authorities. Cornforth had merely the privilege of placing his cattle upon the land for the purpose of pasturing the same. The agreement that he should keep up the fence was to relieve the defendant of that expense and to protect Cornforth from trespassing stock.

The judgment is affirmed.

ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS and STEWART concur.

ASSOCIATE JUSTICE ANDERSON, being disqualified, takes no part in the foregoing decision.

Rehearing denied November 20, 1933.