J. C. STAUFFER,

*Appellant-Appellant,*

vs.

MILTON A. JOHNSON and GWENETH JOHNSON,
*Appellee-Respondents.*

(No. 2578; July 7th, 1953; 259 Pac. (2d) 753)

For the appellant the cause was submitted upon the brief of M. A. Kline and Arthur Kline, both of Cheyenne, Wyoming, and oral argument by Arthur Kline.

For the respondents the cause was submitted upon the brief of Clarence W. Cook and P. W. Spaulding,

both of Evanston, Wyoming, and oral argument by Mr. Cook.

## OPINION

RINER, Justice.

By these direct appeal proceedings a review is sought of a judgment of the District Court of Uinta County. That court affirmed a ruling of the State Board of Land Commissioners hereinafter usually mentioned as the "Board" granting a lease of the School Section 36 Township 13, N., Range 120, West of the 6th P. M., to Milton A. Johnson, the old lessee, in a lease which expired March 1st, 1950. Appellant J. C. Stauffer filed on February 15th, 1950, with the Land Commissioner, usually to be mentioned as the "Commissioner" a conflicting application for the lease of this land. The application of the old lessee and his wife was filed with the commissioner aforesaid on January 9th, 1950.

The parties to this controversy will usually be referred to as follows : the old lessee as the "appellee" or by his name, "Milton A. Johnson" and the rival applicant as the "appellant" or by his name, "J. C. Stauffer." The ruling of the Board affirmed the decision of the Commissioner.

The applicants for the lease in question here are Milton A. Johnson and his wife, Gweneth M. Johnson of Evanston, Wyoming, who made a yearly rental offer of $256.00; the yearly rental on the old lease was

$195.00. J. C. Stauffer of Willard, Utah, tendered a yearly rental offer of $3,500.

The Land Commissioner prior to his disposition of the contest also set out certain information derived from the several applications of these parties as follows:

"IMPROVEMENTS: Applicants Johnson report improvements owned by them on the Section on which they place a valuation of $19,450.00. These improvements consist of two squared log dwellings, two barns one coop, one corral, one shed, one garage, ¾ mile road and bridges, irrigation ditches, 160 rods three inch woven wire fence, three miles of four wire fence and ¾ miles of six wire fence.

"Applicant Stauffer reports improvements on which he placed an estimated valuation of $4,000.00 and that amount accompanied his application as the estimated value of the improvements on the Section.

"STOCK WATER: There is stock water on the Section applied for furnished by Mill Creek.

\* \* \*

"Applicant Milton A. Johnson was the old lessee. Applicants Johnson own land which adjoins the Section in conflict on the north and east and part corners it on the northeast. Part of their leased land is about 2¼ miles northeast of the Section. They own 5 horses, 5 beef cattle, one hog and one dairy cow, a total of 12 head of livestock. Their application reports 290 acres of the Section in grazing, 320 acres in wild hay, 7 acres in wheat and 23 acres in barley. It states that 638 acres of the Section has a water right under Bear River Wyoming Water Division No. 4. They state that the hay meadow had about $100.00 worth of commercial fertilizer scattered on it in 1949. The former lease on this land was held by the Wyoming Farm Loan Board under Loan No. 895—Uinta—Milton A. Johnson and if a new lease is awarded to Mr. Johnson it will also be held by the Farm Loan Department in connection with his loan. This land has been leased by the Johnson interests since January 15, 1921. On June 2,

1947, Mr. Joseph A. Johnson assigned the lease to Milton A. Johnson, who held the lease to its expiration date. The expiring lease carried a rental of $195.00 a year, based on 350 acres of cultivated land at 50c an acre, 240 acres of grazing land at 7½c an acre and 50 acres at 5c an acre. They offered $256.00 a year for the Section in conflict but they did not set out as to just how their offer was figured, but on a per acre basis it would amount to 40c an acre for the 640 acres. When the Johnson family leased this land in 1921 there were 100 acres of hay land on the Section and 540 acres of grazing land. In the years in which they have held the lease they have improved the property to such an extent that it is a very valuable Section, which value exists largely through the labor and money they have put into the land and improvements on the Section, and its present value is due to the efforts of the Johnson family."

As to the application by Stauffer the Commissioner said:

"Applicant J. C. Stauffer owns land which adjoins the Section in conflict on the south and part of his deeded land is about one-half mile southwest of the Section. He owns 900 head of beef cattle. He desires to lease the land for grazing purposes.

"The following letter accompanied his application:

" 'Cheyenne, Wyoming

February 15, 1950

" 'Commissioner of Public Lands

Cheyenne, Wyoming.

Gentlemen:

I am enclosing herewith an application to lease All of Section 36, Township 13 North, Range 120 West, which I have sub-leased for the years of 1946, 1947, and 1948, for which I have paid $10,000.00 for most of the mentioned section.

I am enclosing my check for $7503.00 as the initial

payment and deposit for improvements as set forth in the lease application.

Very truly yours,

/s/   J. C. STAUFFER.' "

"He offered $3,500 a year for the Section or about $5.47 an acre."

In disposing of this contest the Commissioner stated:
"Applicant Johnson was the old lessee in this conflict. The Johnson family had this land leased from the State since 1921, having used the school section as the base of an operating ranch unit. Improvements, such as dwellings, and barns, plus fences, irrigation canals, ditches and hay meadows are on this State land. It is today a valuable section of land in that area and of material value to applicant Johnson in connection with his privately owned grazing land adjoining the school section. It is further recognized that this land is a valuable school section through the labor and money put into this land by the former lessees. Applicant J. C. Stauffer intends to use the land in conflict for grazing purposes in addition to other lands he owns adjoining on the south. It is the opinion of the Commissioner that this school section should serve as a base ranch like it has in the past for the best interests of the State and that the legal preference right of the old lessee to have his lease renewed should prevail. Therefore, the application of Milton A. Johnson and Gweneth M. Johnson to lease the school section in conflict is allowed for a ten year term at an annual rental of $256.00 or 40 cents per acre.

"The application of J. C. Stauffer is disallowed."

In due time Stauffer appealed from the Commissioner's decision of the Board. Explaining the position in which the appellees stood before the Board they filed May 15th, 1950, with the Commissioner an "Answer to the Appeal to the Board of Land Commissioners" filed by Stauffer. Among other things the appellees stated:

"4. Milton A. Johnson and Gweneth Johnson, his wife,

Appellees herein, are the old lessees under Lease No. 3-4899, have had, and now do have actual and necessary use for said Common School Land, and they have been and in the future intend to be dependent upon the use of said Common School Land for their livelihood; and they, Milton A. Johnson and Gweneth Johnson, his wife, are lawful occupants of lands adjoining the above described lands as will be hereinafter shown, and have paid the annual rental charged by the Board of Land Commissioners for the use thereof; they and each of them are now bona fide resident citizens of the State of Wyoming, County of Uinta, and are qualified to lease the subject lands, and that they previously held the subject lands under an approved assignment from Appellee Milton A. Johnson's father, J. A. Johnson, dated June 2, 1947; Appellees predecessor in interest, said J. A .Johnson having first obtained a lease upon the subject lands in January 15, 1921, and until the date of assignment above mentioned enjoyed uninterrupted possession thereof; and that since the date of assignment, Appellees Johnson have paid rentals thereupon when due, have not violated the provision of said lease and are entitled to and hereby assert and claim a preferred right to renew said lease upon the above described lands upon the terms prescribed by the Board of Land Commissioners.

"5. Appellees Johnson further show the Board that their private property holdings adjacent to and nearby Section 36, Township 13 North Range 120 West of the 6th P.M., the challenged section, are as follows:

The East One-Half of Section 25, Township 13 North, Range 120 West of the 6th P.M., All of Section 30, 31, 17; 355 Acres in the East One-half Section 19; West One-Half of Section 16; the West One-Half of Section 20, part of which is Taylor Grazing Land; and the West One-Half of the East One-Half of Section 8, part of which is Taylor Grazing Land, all in Township 13 North, Range 119 West of the 6th P.M., as is shown by Exhibit 'A' hereto appended, a total of 4035 acres, more or less, together with all buildings, improvements and fencing thereon,

"Appellee Johnson's Ranch Operating Plan, identical

to that of his father and predecessor in interest, proved to be the most beneficial and practical plan to all parties in interest by some thirty (30) years of experience hereon, has been to use their entire interest above described as a single unit, said single unit having as its base, integral and focal point said Section 36, Section herein under question.

"The challenged Section 36, held under lease from the State of Wyoming bears all habitable improvements for the *abovementioned* Ranch Operating *Unit*. In character it is generally level, irrigable, covered with adequate sweet soil, and presently bears more tillable land for agricultural crops, and produces more and better hay than the balance of the other sections of the Unit combined. More specifically, 290 Acres of the Section are Pasture Lands, 320 Acres are in wild hay, 7 Acres in wheat, and 23 Acres are devoted to barley. In 1921 when the land was first leased by Appellee Milton A. Johnson's father, J. A. Johnson, the subject land produced 100 Acres of hay, and the balance of the section was pasture land. The estimated value of the subject land at that time was $2.00 per acre, and thru the tremendous efforts, industry and financial outlay of the Johnson family, the value of the land in the challenged section is now about $60.00 to $70.00 per acre.

"The Outlying Sections of the Johnson land, that is all those except Section 36, the challenged section, are used in the Unit Plan for grazing lands in the summer, and owing to the arid and generally rugged contour and character of the land, only a comparatively small part of the Outlying Sections are tillable, and but a small part of them are capable of producing wild hay. The Outlying Sections, however, do provide sufficient range for a limited number of animals during the summer months. In the late fall and early winter, the Outlying lands are not capable of sustaining any appreciable amount or number of animals, and then only if the animals remain in the lower reaches of the said sections bordering the canals, creeks or springs. In the winter months, the Outlying Sections are almost, if not wholly, inaccessible and therefore incapable of any use during this period. It is therefore necessary and beneficial to Appellees or their successors that Section 36 be kept

and held in this Unit Operation to perform its base and fundamental purposes. In the summer it produces upward of 350 Acres of hay for winter feeding, provides pasture for cattle and other animals, and grows grains necessary for animal feeding. In the winter Section 36 provides shelter for the range animals due to its peculiar and particular location and character, and as well is used as a control area and feeding lot for the entire herd. In the late fall and early spring the meadows and pastures provide feed for the range cattle necessary before winter feeding is required or the spring range becomes available.

"Since this Section 36 is so vital to the operation of the Ranch Unit the Appellees further show the Board, that in event the Commissioners decision is not affirmed, and his lease is not renewed, the value of the surrounding lands, the Outlying Sections, so called, will be so substantially reduced and impaired through the loss of said Section 36, so as to render the Outlying Sections valueless because of the key and focal position of said Section 36 in the Unit Operation as herein described. "Appellees Johnson further show the Board that they are now indebted to the Farm Loan Board on a certain mortgage, and that they have diligently and faithfully performed their obligations under said mortgage, and that if the subject lease is not renewed, the security for the mortgage will be substantially impaired and that their ability to perform under the mortgage will be greatly prejudiced because Appellees will be left with lands which have limited use, and which are not amenable in themselves to the Ranch Unit Operation, and consequently of little value to Appellees or to a prospective purchaser.

"Appellees further submit that with the approval of the Board Appellees have executed with the Payette Livestock and Feeding Company, covering the lands herein mentioned, including Section 36 and the improvements thereon, a certain 5 year sub-lease, to expire December 31, 1953, and that if Commissioner's decision is not affirmed, the Appellees, by the terms of the approved lease will lose the benefits and advantages thereof in its entirety, that is not only upon the subject State Section 36, but also upon his lands privately owned as herein described as the Outlying Sections, and

thus substantial damage will result to Appellees herein and to their sub-lease.

"6. Appellees Johnson further show the Board that largely through the efforts of his father and predecessor in interest, J. A. Johnson, the Pine Grove Canal has been maintained and operated; that the said Canal is capitalized at approximately 1040 Shares, each Share representing One Acre of water; that the total amount now held by Appellees upon all his land is the controlling interest, 775 Shares, and that the appropriation of Section 36, the challenged section, is 638 Acres; that the present owners of the Canal are presently and have been in the past amenable to the Johnson interests, and that they, and all of them, have continuously improved, repaired and maintained and extended said Canal to the mutual advantage of its present shareholders; that if the Commissioner's decision is not affirmed, the appropriation of 638 Acres of the total 1040 Acres of the Canal will go (to) the new lessee of Section 36, thus giving the new lessee the controlling interest in the Pine Grove Canal, leaving Appellees or their successors but 137 Acres for the balance of their property holdings."

On June 1st, 1950 the Board approved the decision of the Commissioner the minutes of its action being as follows:

"The Board approved the Commissioner's Decision allowing the application of Milton Amenzo Johnson and Gweneth Marsh Johnson for a ten year term but increased the annual rental to $320.00. The Board recognizes the position of the old Lessee in that he and his family are *old residents in the State of Wyoming and this school section forms an integral part of a ranching unit which has been operated by the Johnson family for a period of thirty years,* and the records show that the old Lessees, applicants Johnson, have been satisfactory Lessees and further that the high value attached to the land at present *is largely due to the labor and money put into the land by these applicants.* The Lease is valuable to the Wyoming Farm Loan Board as collateral security on the Milton A. Johnson Farm Loan. *An exorbitant rental rate is not favored since*

*the Board has found in similar cases that such practice may result in future cancellation of the lease or request for a reasonable rental rate at a later date conformable to existing times and conditions."* (Italics supplied.)

The increased rental directed by the Board the appellees paid to it promptly upon notification of such increase.

Thereafter J. C. Stauffer appealed to the district court aforesaid seeking to reverse the action of the Commissioner and the Board as above indicated. The cause was heard on November 5th, 1951, by the district court without a jury with the result hereinabove indicated. On the date last mentioned and after the cause was called for trial Stauffer filed over appellee's objection what is designated as a "Petition on Appeal." This filing states the grounds "relied upon by him" for a reversal of the Board and Land Commissioner's decision rendered on June 1st, 1950. We shall abstract this statement as concisely as possible:

## Sub-Division I.

In its paragraph 1, it is alleged that in the lease between the State of Wyoming and Joseph A. Johnson dated about July 14th, 1941, which was assigned to appellees on June 2, 1947, that instrument provided that the lessee "shall in no event sub-lease said lands for a cash consideration in excess of the rental paid to the State unless one-half of such excess rental is paid to the State and a copy of such sub-lease filed in the Office of the Commissioner of Public Lands. That said provision was inserted in said lease pursuant to Section 24-113, Wyoming Compiled Statutes, 1945." That despite the provisions of the lease and the Statute aforesaid: "appellees, or their predecessors in interest, subleased said lands for a cash consideration of $3,250 in each of the years 1946 and 1947 and for $3,500 in the

year 1948." That appellees did not file a copy of such sub-lease with the Commissioner nor pay to the State of Wyoming one-half of the excess rental therefrom which resulted in the State being defrauded of over $1,500 in each of said years.

In its paragraph 2, it is stated that appellees in their application filed before the Board on January 9th, 1950, answered "No" to question No. 12 as to whether they had ever sub-leased said lands for a cash consideration in excess of the rental paid to the State without payment of one-half of such excess to the State; that this answer was false in view of the allegations of paragraph 1, supra. In its paragraph 3, it states that appellees filed with the Board a sub-lease between them and the Payette Livestock & Feeding Co. for the years 1949 to 1953 inclusive by which appellees sub-leased to said Company all their deeded lands and also section 36 in controversy for an annual cash consideration of $5,000. That this sub-lease provided that this rental should be apportioned thus: $1,500 for the State land and $3,850 for the deeded land. That the annual rental of the deeded lands was not over $1,750 per year at the time the lease was executed and the actual annual rental value of Section 36 in dispute was over $3,250; that appellees withheld from the Board the fact that in each of the several years before 1949 they had sub-leased the State section aforesaid for an amount equal to or over $3,250 and they had sub-leased their deeded lands for an amount under $1,750 for each year. That this apportionment as stated above constituted a fraud upon the Board and the people of Wyoming.

### Sub-Division II.

In Sub-Division II of said "Petition on Appeal" it is asserted that the Board abused its discretion in failing to follow its rules in view of the matters alleged in

sub-division I supra, also in holding that appellees were entitled to the preference right granted to an old lessee despite the fact that the evidence showed the Board that appellees had violated the provisions of their expiring lease and did not pay the rental due; also in finding that appellees had been satisfactory lessees although they had failed to file copies of sub-leases with the Board and to pay excess rentals due the State; also in failing to find that appellees had no actual nor necessary use for Section 36 because appellees had sub-leased that land for five years ending December 31, 1953, with renewal right ending December 31, 1958.

### Sub-Division III.

In this sub-division it was asserted that the Board had illegally exercised its discretion in admitting parol testimony to contradict the terms of the written lease agreement dated December 6, 1947, between appellant and appellee, Milton A. Johnson.

To this petition the appellees orally demurred but the demurrer was overruled and they were directed by the court to dictate an answer for the record. This was done. Their answer was, for the most part, a denial of the charges of fraud made against the appellees in said petition; they alleged that they had sold certain of the growing crops upon the Section 36 aforesaid with those upon other lands owned by them to Stauffer for a lump sum in each of the three years aforesaid; that their lands were not segregated from the State land and could not be segregated and the sales apportioned; that appellees admitted they sub-leased to the Payette Livestock & Feeding Co.; that a copy of this lease was filed with the Board which Board determined what excess rental was due the State and that that amount has been paid in addition to the rental called for by their state land lease; that the sale of grazing privileges was ex-

plained to the Commissioner and that he advised appellees that nothing was due the State for the sale of such grazing privileges; that all rental payments due the State have been paid and that the lease was in good standing when the present lease was issued; that the Board, upon reasons satisfactory to it, found that renewing the lease to the Johnsons "inured to the best interests of the State."

Attention is now directed to evidence in favor of the appellees which was not disputed and to which alone we are permitted to look. See Jacoby vs. The Town of the City of Gillette, 62 Wyo. 487, 493-4; 174 P (2d) 505 and cases there cited.

J. C. Stauffer is a resident citizen of the State of Utah, living at Willard in that state. He winters his cattle in that state and brings them back to Wyoming for summer and fall pasturage. Stauffer's son-in-law, Reese, lives in Utah in the winter and in Wyoming in the summer. Stauffer runs, around 800 to 900 head of cattle and has done so for the last four to six years. Mill Creek runs through Section 36 aforesaid. Stauffer wants the land in dispute for grazing purposes. On December 6th, 1947, Stauffer and Milton A. Johnson entered into a written agreement as follows:

"AGREEMENT Dec. 6, 1947

"This agreement made and entered into this 6th day of December, 1947, by and between Milton A. Johnson of Evanston, Wyo. and J. C. Stauffer of Willard Utah

Witnesseth

"That for and in consideration of $1000.00 One Thousand Dollars in hand paid by J. C. Stauffer on the above date Milton A. Johnson agrees to rent Sec. 36 all except the Alfalfa field and the ground used for farming at the NE corner of the said Section.

"Milton A. Johnson agrees to rent this ground for

$3,500.00 for the 1948 season. This leaves $2500.00 to be paid in 1948.

"Milton A. Johnson agrees to do all the ditch work required.

"Witness

/s/ Joseph A. Johnson    /s/ Milton A. Johnson
/s/ Robert M. Reese      /s/ J. C. Stauffer"

The two checks given in payment to Milton A. Johnson by J. C. Stauffer for the amount due under this agreement, the one dated December 7th, 1947, and the other dated November 23, 1948, both bore the notation "for pasture." J. C. Stauffer pastured his cattle during the season of 1947 on Sections 36 and 31 from May 1st, 1947, to January 1st, 1948, pursuant to a written agreement reading:

"Evanston, Wyo. November 13-46

"This agreement made and entered into by and between Milton A. Johnson of Evanston, Wyo. and J. C. Stauffer of Willard Utah.

Witnesseth

"That W. (J.) C. Stauffer agrees to rent the following described pasture. Sec. 36 from the West to the Buck pasture and Mill Creek also the land on Sec. 31 in between Mill Creek and Cotton Wood Creek for the consideration of $3,250.00 Thirty-two hundred fifty dollars. Milton Johnson agrees to rent this pasture with all privileges to Mr. Stauffer to water land and handle from May 1st-Jan. 1.-48.

"Witness /s/ J. C. Stauffer          $1000.00
         /s/ M. A. Johnson           Paid Nov 13-46"

For this pasturage J. C. Stauffer paid Milton Johnson by checks the sum of $3,250; these checks had on them a notation "for pasture."

For the season of 1946 J. C. Stauffer pastured his cattle on part of Sections 36 and 31 aforesaid. For this

pasturage J. C. Stauffer gave Milton Johnson two checks, one dated November 13, 1946, and the other dated May 18, 1946, the May check bearing the notation "part payment for pasture" and the other simply "for pasture."

J. C. Stauffer pastured his cattle on Sections 36 and 31 in 1946; the written agreement for that year appears to have been lost; Milton Johnson kept 59 acres out of Section 36; J. C. Stauffer did not cut hay on the land but used it solely for grazing—every year the same. Alec Jamieson used Milton Johnson's deeded lands in the years 1946, 1947 and 1948.

During 1949 the McFarlands used Section 36; they did business under the name of The Payette Livestock & Feeding Co. in 1946; J. C. Stauffer put his cattle on Sections 36 and 31 for grazing only until October. Johnson was to do the Irrigation on the land. Milton Johnson lived in the house on Section 36 part of the time; Johnson did brush-harrowing on the meadows in Section 36—an essential job to keeping the meadows in good condition; Milton Johnson fixed the fences on Section 36. J. C. Stauffer did not consider he had any right to live in Johnson's house. Johnson did ditch work on Section 36; there were no copies of the agreements between J. C. Stauffer and Milton Johnson filed with the Board and no excess rental paid the Board for the years 1946, 1947 and 1948.

Johnson received $1625 as rental for his deeded lands in the years 1946, 1947 and 1948 from Jamieson; Johnson raised crops on both section 36 and his deeded lands; he raised grain in the northeast corner of the school section. Johnson lives in Evanston and is a locomotive fireman; part of the time he lived on the ranch on Section 36 irrigating the land, planting grain and harvesting it; he worked on the ranch between his rail-

road runs; sometimes laying off railroad work for two weeks at which time he went to the ranch; he leased roughly 3000 acres of deeded land to Jamieson for the years, as above mentioned, 1946, 1947 and 1948. He kept 75 or 80 acres for himself; part of this was the school section 36 and part of it his deeded land immediately adjacent to that section. In September 1948 he leased most of his land to the Payette Livestock & Feeding Company. He kept 80 or 85 acres for his own use and sub-leased all the rest of his deeded land and leased lands to the Payette Livestock & Feeding Co. There are 4,000 acres more or less in the Johnson ranch; section 36 is all valuable land. Johnson's deeded lands are mostly sagebrush and hilly. In regard to the Payette Livestock & Feeding Co. $3,850 was apportioned for the deeded land and $1,150 for the State land; $780 for improvements; this apportionment was made on the advice of the Commissioner of Public Lands.

No excess rental was asked by the Commissioner for the years 1946, 1947 and 1948. It was explained to the Board about the Stauffer agreements and the Board did not call for any excess rental. When such excess is due the Board asks for it; the Board approved the sub-lease between Milton Johnson and the Payette Livestock & Feeding Co. The State's share of excess rental was taxed at $87.50 by the Board and it advised Johnson that this should be paid with the rental payment due March 1st, 1949. This amount Johnson paid on the date fixed. Alec Jamieson is a brother-in-law of Milton Johnson. The amount the latter received from Jamieson as rent did not represent the entire market value of the deeded land; Milton Johnson had long waits between his trips on the railroad and spent this time on the ranch, building fences, cleaning ditches and repairing buildings; the pasturage for J. C. Stauf-

fer's cattle was for the time June 1st until the feed was gone or snow drove them out; the house on Section 36 was never mentioned. J. C. Stauffer was interested only in pasturage; he had his own house up at their place. Milton Johnson remained in possession of the house, barn and buildings on Section 36; Milton Johnson exercised general supervision and maintenance and repair of the property; that the notations "for pasturage" were all on the checks when Johnson received them and were written by J. C. Stauffer when the checks were given to Milton Johnson; the latter's father erected the house when he (the father) held the lease on Section 36. The road to the house is ¾ mile long from the County road to the buildings with 12 bridges on the road built by Milton Johnson and his father. There is a meadow on the deeded section 31 and it yields up to between 80 and 100 tons of hay; the barns, residence and buildings are on the northeast corner of Section 36; that is the most valuable land in Milton Johnson's holding; Johnson and his father have been using Section 36 since the lease from the State in 1921 was issued; if Section 36 were lost the rest of the ranch would not be so valuable. The house would now cost $15,500 to replace; the pump house $300, the barn about $4,500, the sheep barn $5,000; garage and chicken coop would each cost about $350 to replace. J. C. Stauffer reduced his rental offer from $3,500 to $2,500 a year. He never has cattle in Wyoming as late as December 6th; that the checks aforesaid were given for pasturage and not for any land.

The statutory provisions involved in this litigation are as shown by W.C.S. 1945; Section 24-109 which reads:

"No person shall be qualified to lease state lands, except one who is the head of a family, or unless he or she has attained the age of twenty-one (21) years; but in no

event may a person lease state lands unless he or she is a citizen of the United States, or has declared his or her intention to become a citizen of the United States; nor shall a firm, association or corporation be qualified to lease state lands unless it has complied with the laws of this state. (Laws 1929, ch. 108, § 9; R.S. 1931, § 91-109; Laws 1935, ch. 106 § 1.)"

Section 24-113 in its material clauses reads:

"All state lands leased by the state board of land commissioners for grazing purposes shall be leased in such manner and to such parties as *shall inure to the greatest benefit to the state. Except as herein provided,* preference shall in all cases be given to applicants *who are bona fide resident citizens of the state* qualified under the provisions of Section 91-109 (§ 24-109), as amended, and to firms, associations or corporations authorized to transact business in the state, having actual and necessary use for the land and who are the owners, lessees or lawful occupants of adjoining lands, who offer to pay an annual rental for the use of the land for a period of ten (10) years, within the minimum and maximum limits of appraised rental value as provided in Section 91-108 (§ 24-108); provided, that an applicant who is the holder of an expiring lease, and has paid the rental when due, and has not violated the provisions of the lease, and is qualified under the provisions of Section 91-109 (§ 24-109), shall have a preferred right to renew such lease.

"If the lessee of state lands shall assign or sub-lease all or any part of the lease area, said lease shall be subject to cancellation unless such assignment or sub-lease is approved by the board of land commissioners; however, no such approval shall be arbitrarily or unreasonably withheld and *all action upon each application therefor, shall be such as will inure to the greatest benefit to the state;* provided, that in no event shall said lands be sub-leased for a cash consideration in excess of the established rental rate unless one-half of such excess rental be paid to the state. * * *

"Provided further, that the state board of land commissioners shall in the leasing of state agricultural lands lease all such lands in such manner and to such

parties as *shall inure to the greatest benefit to the state;* provided, that an applicant who is the holder of an expiring lease, and has paid the rental when due, and has not violated the provisions of the lease, and is qualified under the provisions of Section 91-109 (§ 24-109), shall have a preferred right to renew such lease. (Laws 1929, ch. 108, § 13; 1951, ch. 45, § 1; R.S. 1931, § 91-113; Laws 1943, ch. 60, § 1; 1945, ch. 34, § 1.)" (Italics supplied.)

Regulation or rule No. 7 of the Board is to this effect:

"7. All applications for lease, purchase or entry of State or School land should be made on blanks which are furnished on request by the Commissioner of Public Lands and all statements therein called for must be made in full; any false or wilfully incomplete statement will be considered as fraud, deceit or misrepresentation and will be cause for the rejection of such application. (Sec. 91-203, Wyo. Rev. Stat., 1931.)"

Regulation or rule No. 21 of the Board provides:

"21. A lessee of State lands may enter into a sub-lease embracing all or any part of the lease area. A copy of all sub-leases of any kind or nature must be filed in the office of the Commissioner and approved by the Board of Land Commissioners. In no event shall the lands embraced in the grazing lease be sub-leased for a cash consideration in excess of the rental paid the State unless one-half (½) of such excess rental be paid to the State. (Chap. 60, Sess. Laws of Wyo., 1943 and Ch. 34, Sess. Laws of Wyo., 1945.)"

This court has, on a number of times past, had occasion to discuss the effect of the statutory provisions mentioned above and we may here briefly refer to several.

Speaking of the renewal of state agricultural or grazing leases in connection with the clause that it "shall inure to the greatest benefit to the State" in

Kerrigan vs. Miller, 53 Wyo. 441, 454; 84 P. (2d) 724, it was said:

"It refers, probably to the general benefit to the state and the people thereof. We realize that such term is elastic, and that if it is to be applied at the mere discretion of the board, the provision for the right of renewal may become a 'scrap of paper.' But we think that the legislature has in this instance distinctly limited or regulated the board's discretion. It must take into consideration the right given by the statute. Wyodak Chemical Co. v. Land Commissioners, supra (51 Wyo. 265, 65 P. (2d) 1103), and cases cited. The right to preference is a *very substantial* right. (Italics already supplied.) Manning v. Perry, supra (48 Ariz. 425, 62 P. (2d) 693.) The statute clearly shows that *the legislature meant to make it the policy of the state to recognize equities in those who have built up a ranching business in the state which should be considered in passing upon applications for renewal of expiring leases, and that the absence of such policy would be injurious if not destructive to that industry.* Veseley v. State, supra (40 N. M. 19, 52 P. (2d) 1090). Manning v. Perry, supra. The Commissioner and the board must give effect to that policy. If such general benefit is equal in the case of two or more applicants to the land, the right of renewal which one of them may have must prevail. We think that in order that the board would be warranted in rejecting the right of renewal, it should reasonably clearly appear that it is for the general benefit to the state and its people to do so." (Italics supplied.)

In Banzhaf v. Swan Co., 60 Wyo. 201, 211; 148 P. (2d) 225, 228, 229, referring to our earlier case of Miller v. Hurley, 37 Wyo. 344, 262 P. 238, this was said:

" "* * * we are convinced that the holding of the case last mentioned is the correct view and that the trial "de novo" as mentioned in Section 91-306, W.R.S. 1931, is simply limited to a determination on the part of the District Court whether on the facts proven there was "an illegal exercise" of the Board's discretion, a case

of fraud, or a "grave abuse of such discretion." *Unless one of these three elements should appear the action of the Board should not be disturbed.'* " (Italics supplied.)

and further, mentioning a pertinent decision of the Idaho Supreme Court, we quoted at p. 213 of 60 Wyoming:

" 'They are, as it were, the trustees or business managers for the state in handling these lands, and on matters of policy, expediency and the business interest of the state, they are the sole and exclusive judges so long as they do not run counter to the provisions of the Constitution or statute.' "

and then remarked, (p. 213)

"Under our own decisions and the cases cited and briefly reviewed from other jurisdictions possessing constitutional language concerning their land Boards quite like ours, as we have noted, it is apparent that the discretion of the Board whose decision is here involved should not lightly be over-turned."

So in Mayor vs. Board of County Commissioners et al, 64 Wyo. 409, 425; 192 P. (2d) 403, 409, 410, it is pointed out that:

"The emphasis laid by the legislature upon the disposal of grazing school lands of the state by leasing, approval of sub-leasing or assignment and also the disposal of the agricultural school lands of the state by leasing as concerns the phrase 'inure to the greatest benefit of the state' becomes decidedly heavy when it is noted that these words are repeated no less than three times in Section 24-113 W.C.S. 1945 quoted above, which section appears to be a re-script of the final amending statute, Ch. 34, Laws of Wyoming, 1945. It would seem that the legislature was endeavoring to enlarge the discretion of the Board in its disposal of the school lands under said Section 24-113 if possible."

and also that (p. 428 of 64 Wyo.) :

"In the matter at bar the cases to which reference has hereinabove been made make it reasonably clear that

the discretion of the Board in both the leasing and the sale of school lands of this state has been given, as we have many times before held, a very broad scope subject only to the limitation that review by the courts may be had of its action in the event of the Board's transgression of provisions of positive law, fraud or having committed a grave abuse of that discretion. Whether the Board has exceeded this limitation must be determined from the varying circumstances of individual cases."

Again in Howard vs. Lindmier 67 Wyo. 78, 86, 214 P. (2d) 737, 739, we quoted from the pertinent case of Manning vs. Perry, supra, 48 Ariz. 425, 62 P. (2d) 693, in part thus:

"* * * *'the rule adopted and followed by appellate courts here and elsewhere of deferring their opinions as to the weight and credibility of the evidence to that of the trier of the facts in the first instance should be adhered to in land lease cases.* The Land Department is certainly as well qualified as the court to investigate and pass upon the conflicting claims of applicants for leases and determine which has the best right to the lease.' " (Italics already supplied.)

In Appellant's brief, page 20, it is urged that:

"The agreements between appellant, J. C. Stauffer and appellee Milton A. Johnson in reference to the use of this School Section were sub-leases within the meaning of Section 24-113 of Wyoming Compiled Statutes, 1945."

and also that (p. 11) :

"The finding of the District Court that there was no illegal exercise of discretion and that there was no abuse of discretion on the part of the Board of Land Commissioners in the lease of the land in controversy to appellees is not only contrary to the evidence and not supported by the evidence, but is also contrary to law."

So it is insisted that appellees committed a fraud against the State when they answered "No" to the

query whether or not, they had sub-leased the section 36 aforesaid and that it was admitted that they did not pay to the State its portion over and above the rental money claimed to be due the State, for the years 1946, 1947 and 1948.

We think the appellant is in error in this position. We may recall that Mr. Chief Justice Potter remarked in Sayles vs. Wilson 31 Wyo. 55, 72; 222 P. 1020, 1026, relative to a contract in regard to crops grown upon the land that:

"But we are not convinced that the contract is to be considered as creating the relation of landlord and tenant. Notwithstanding the statement in the contract that the premises are leased, and that it mentions rent, and notwithstanding also the provision that the second party will yield up the premises at the expiration of the 'lease' and keep them in good repair during the 'lease', we think that, in view of the circumstances under which the contract was made, and its practical construction by the parties themselves, the better interpretation of its provisions is that it creates the relation, not of landlord and tenant, but landlord and cropper."

Finally in Bond & Mortgage Corporation vs. Frank Pulley 95 Mont. 337, 26 P. (2d) 645; 89 A.L.R. 1320, it was directly held in Syllabus 1 of A.L.R.:

"A covenant by the lessee of a ranch not to sublet without the lessor's consent is not violated by entering into a written agreement to pasture up to a stated number of cattle in a certain field during a period mentioned." and in the note appended to the report of the case in

89 A.L.R. the editor says on page 1325:

"Restrictions against assignments, being a restraint against alienation, are not looked upon with favor by the courts, and from the earliest times have been construed by courts of law with the utmost jealousy to prevent the restraint from going beyond the express stipulations. 16 R. C.L. 832.

"The rule is well settled that an agreement by a lessee with a third person for the permissive use by the latter of the leased premises does not constitute a violation of covenants in a lease against assigning or subletting, but *merely amounts to a license to use the property.*" (Italics supplied.)

Citations from the appellate courts of some 15 different jurisdictions are set forth, many of them, when reviewed, are closely in point with the case at bar.

The later case from the Supreme Court of Washington, Vander Vate vs. Watson 19 Wash. (2d) 68, 73; 140 P. (2d) 964, 967, states that:

"On two occasions at least, the respondent permitted third parties to pasture cattle temporarily on the stubble after the crop had been removed. To this, appellant violently objected, and some of the acts enjoined spring from that grievance. It is contended that she had the right to object, on the ground that this was a breach of the lease which provided that no part of the premises should be 'sublet or underlet without the written consent of the Lessor.' But these temporary pasturage arrangements did not purport to create any kind of an estate in the persons who pastured their cattle in the Watson fields.

"A similar contention was before the supreme court of California in Harrelson v. Miller & Lux, Inc. 182 Cal. 408, 413, 188 P. 800, 802. Plaintiff had leased a farm to one Crow. During the term of the lease, Crow granted to the defendant the right to pasture sheep. Among other things, the court, in a unanimous en banc decision, said: 'Plaintiff insists, however, that whatever may have been Crow's rights to pasture the grain land himself, the granting of the right to the defendant amounted to a violation of the covenant in the lease against subletting. The contract between Crow and defendant amounted essentially to a sale of the feed coupled with a mere license to come upon the land to use it. If Crow had a right to sell the feed at all, he certainly had a right to grant the right to use it on the land, for obviously the stubble at least could not be otherwise utilized. That the granting of such a right

is not a violation of a covenant against subletting has been directly held in Baldwin v. Jacobs, 182 Iowa 789, 166 N.W. 271, 273.' "

The authorities last above reviewed were called to our attention by neither Counsel for appellant nor counsel for appellees.

Without extending this opinion further, though much more could be said, we conclude that the appellees committed no fraud in answering "No" to the question propounded in the application and referred to above, or in failing to file copies of the written agreements in regard to pasturage or in failing to divide with the State the amounts received under those agreements for they did not violate the covenant against subletting. We conclude also that the Board did not grossly or at all abuse its discretion in awarding the lease in question to appellees and there was no "illegal exercise" of the Board's discretion. This is said in view of the authorities cited above. It results from what we have indicated above that the decision of the District Court of Uinta County in affirming the action of both the Board and the Commissioner was correct and it should be affirmed.

Entertaining these views it becomes unnecessary to consider appellees' motion to dismiss this appeal.

Affirmed.

BLUME, C.J., and HARNSBERGER, J., concur.